Filed 1/23/15  P. v. Schuster CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TIMOTHY NEAL SCHUSTER,<br><br>    Defendant and Appellant. | G048817<br><br>(Super. Ct. No. R01466)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Carla Singer, Judge.  Affirmed.

Daniel R. McCarthy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

Timothy Neal Schuster appeals from an order revoking his Postrelease Community Supervision (PRCS) (Pen. Code, §§ 3450 et. seq.)[1] after he violated the terms of supervision by continuing to use controlled substances. He contends his probation officer's testimony about the results of drug testing was hearsay and his due process rights were violated by admission of that testimony. We find no error and affirm the order.

FACTS & PROCEDURE

In July 2011, Schuster pleaded guilty to possession for sale of methamphetamine (Health & Saf. Code, § 11378) and destroying or concealing evidence (§ 135), and he admitted a previous felony conviction and two prison priors (Health & Saf. Code, § 11370.2, subd. (c); § 667.5, subd. (b)). The court sentenced him to two years in prison. The trial court imposed various fines, penalties, and assessments including a $200 parole revocation restitution fine (§ 1202.45), which was suspended unless parole was revoked. On June 1, 2012, Schuster was released from prison to PRCS, on conditions that included he must comply with all his probation officer's instructions and not engage in any illegal conduct.

On June 11, 2013, the probation department filed a petition for revocation of PRCS. The petition alleged that on three dates in late 2012, Schuster tested positive for methamphetamine. The petition also alleged that in May 2013, Schuster was arrested by the police for possession of a controlled substance for sale (Health & Saf. Code, § 11378), and possession of drug paraphernalia (Health & Saf. Code, § 11364.1).

A hearing on the petition to revoke PRCS was held on August 2, 2013. The prosecution proceeded on the positive drug test allegations alone. The only witness was Schuster's probation officer, Debby Rodriguez.

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

2

Rodriguez testified she took saliva swabs from Schuster on three dates (September 5, 2012, October 17, 2012, and November 28, 2012), and submitted them to Redwood Toxicology laboratory for testing. Rodriguez had been taking fluid samples and submitting them to Redwood Toxicology for nine years, and had taken hundreds of such samples from supervisees. She had received both positive and negative results over the years and had come to rely on the results of Redwood Toxicology's testing.

Over Schuster's hearsay and lack of foundation objections, Rodriguez testified laboratory reports for each of the three specimens obtained from Schuster came back positive for methamphetamine. When the trial court asked the prosecutor to lay a foundation for Rodriguez's testimony, he elicited the following. Rodriguez's practice was to obtain a saliva sample from the supervisee with a swab, insert the swab into a test tube, and seal the tube in the supervisee's presence. The sample would be labeled with its date, and the supervisee's name and case number. She would send the sample to Redwood Toxicology in packaging provided by the lab. Rodriguez would later obtain the results of the drug testing from Redwood Toxicology's website, which she had been trained by the probation department to use. She would use the supervisee's name and case number to access the test results and print out a report on the results from the website. She downloaded the three lab reports for Schuster, which were the same or similar to the reports she had received from Redwood Toxicology for the past nine years.

On cross-examination, Rodriguez testified she reviewed the three lab reports pertaining to Schuster prior to the PRCS revocation hearing, which she had placed in Schuster's case file, but she did not bring the reports to the hearing. She explained the probation department had a policy of not releasing such reports unless they were subpoenaed, which they had not been. Rodriguez testified that aside from downloading the test results for Schuster's three samples, she had not spoken with anyone from Redwood Toxicology about the test results. She did not know who conducted the tests or uploaded the test results onto the lab's website. She was not familiar with the lab's

3

testing protocols, training requirements, accreditation, or whether its instruments were properly calibrated or maintained. When Schuster's saliva tests came back positive for methamphetamine, Rodriguez discussed the test results with Schuster and that he needed to get treatment for his drug addiction. At the time of the positive drug tests, Rodriguez did not impose a sanction such as flash incarceration because of Schuster's mental illness and the fact he was receiving therapy with the health care agency; she wanted to "let him continue doing that."

The trial court found Schuster violated the terms and conditions of his PRCS because he had tested positive for methamphetamine use. At the sentencing portion of the hearing, Schuster's counsel argued his drug addiction was largely driven by his mental illness and he was probably self-medicating. Counsel argued recent upheavals in Schuster's life, including his mother's death, had contributed to his current drug use. The prosecutor observed the probation report stated Schuster had admitted to his recent methamphetamine use, and the probation officer reported Schuster's most recent drug test had again come back positive for methamphetamine.

The trial court ordered PRCS be revoked and reinstated. Schuster was ordered to serve 180 days in jail, with 108 days actual and conduct credit, and the $200 parole/PRCS revocation fine was ordered to become effective. Schuster appealed the PRCS revocation order.

We granted the Attorney General's unopposed request for judicial notice of jail records and the probation department contact history for Schuster. Schuster completed his term of incarceration on September 6, 2013, and was released from custody.

DISCUSSION

*1. Mootness*

The Attorney General argues Schuster's appeal is moot because he is no longer in custody and PRCS was reinstated. The Attorney General cites *Spencer v.*

4

*Kemna* (1998) 523 U.S. 1, 7, for the proposition that a parolee's habeas corpus petition premised on a claim of wrongful revocation of his parole becomes moot when the period of incarceration is over unless "collateral consequences" are demonstrated. The Attorney General argues Schuster has not shown any "collateral consequence" that results from revocation of his PRCS and now that he has been released from custody there is no practical relief that can be granted if we were to reverse the order revoking PRCS.

"A case becomes moot when a court ruling can have no practical impact or cannot provide the parties with effective relief." (*Simi Corp. v. Garamendi* (2003) 109 Cal.App.4th 1496, 1503.) As Schuster points out, there is relief to be had—albeit nominal relief. Revocation of PRCS resulted in the previously suspended $200 parole revocation fine becoming effective—which was a *direct* consequence of the revocation (see e.g. *In re Resendiz* (2001) 25 Cal.4th 230, 243, fn. 7 [restitution fine a direct consequence of guilty plea], abrogated on another ground by *Padilla v. Kentucky* (2010) 559 U.S. 356, 370-371). A reversal of the order could provide Schuster relief from that fine. (See also *People v. Nolan* (2002) 95 Cal.App.4th 1210, 1213 [rejecting mootness challenge to probation revocation order because "[t]he probation violation finding is part of [defendant's] permanent record . . . [and] the appeal affords the opportunity to erase the 'stigma of criminality'"].) The appeal is not moot, and we decline the Attorney General's invitation to dismiss it.

*2. Admissibility of Probation Officer's Testimony about the Drug Test Results*

Schuster contends the probation officer's testimony about the results of the laboratory tests was inadmissible hearsay and its admission violated his due process rights. We reject his contention.

The 2011 Realignment Act "shifted responsibility for housing and supervising certain felons from the state to the individual counties." (*People v. Cruz* (2012) 207 Cal.App.4th 664, 671.) Under the Realignment Act, a qualifying felon is subject to PRCS "for a period not exceeding three years immediately following release"

5

(§ 3451, subd. (a)), subject to several conditions including, as relevant here, that the supervisee obey all laws and follow the directives and instructions of the supervising county agency (e.g., probation department) during his or her period of supervision. (§ 3453, subds. (b)(d), § 3454, subds. (a)-(b).)

Violation of conditions of PRCS can result in intermediate sanctions (e.g., flash incarceration of up to 10 days (§ 3454)). But under section 3455, subdivision (a), if "the supervising county agency" determines "intermediate sanctions . . . are not appropriate," it "shall petition the court pursuant to [s]ection 1203.2 to revoke, modify, or terminate [PRCS]." An uncodified section of the legislation that added the reference to section 1203.2 declared, "[b]y amending . . . [s]ection 3455 . . . to apply to probation revocation procedures under [s]ection 1203.2 . . . , it is the intent of the Legislature that these amendments simultaneously incorporate the procedural due process protections held to apply to probation revocation procedures under *Morrissey v. Brewer* (1972) 408 U.S. 471 [(*Morrissey*)], and *People v. Vickers* (1972) 8 Cal.3d 451, and their progeny." (Stats. 2012, ch. 43, § 2(b), p. 1965.)

Probation violations need only be established by a preponderance of the evidence. (*People v. Jackson* (2005) 134 Cal.App.4th 929, 935; § 3455, subd. (c).) We review the revocation of probation for abuse of discretion. (*People v. Rodriguez* (1990) 51 Cal.3d 437, 443, 445.)

Probation revocation is not part of a criminal prosecution, and, as a result, "the full panoply of rights due a defendant in [a criminal] proceeding does not apply." (*Morrissey, supra,* 408 U.S. at p. 480.) The right of confrontation in a probation revocation proceeding is not absolute, and where appropriate, courts may consider "the conventional substitutes for live testimony, including affidavits, depositions, and documentary evidence." (*Gagnon v. Scarpelli* (1973) 411 U.S. 778, 782, fn. 5.) As the Supreme Court stated in *Morrissey*, *supra*, 408 U.S. at page 489, "the process should be

6

flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial."

Hearsay evidence is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200, subd. (b).) Section 1203.2 authorizes the admission of hearsay evidence in a probation revocation proceeding. Section 1203.2, subdivision (a), states probation may be revoked or terminated "if the interests of justice so require and the court, in its judgment, has reason to believe from the report of the probation officer or parole officer or otherwise that the person has violated any of the conditions of his or her probation . . . ." (See also § 1203.2, subd. (b)(1) ["After the receipt of a written report from the probation or parole officer, the court shall read and consider the report and either its motion or the petition and may modify, revoke, or terminate the supervision of the supervised person upon the grounds set forth in subdivision (a) if the interests of justice so require"].)

"As long as hearsay testimony bears a substantial degree of trust-worthiness it may legitimately be used at a probation revocation proceeding. [Citations.] In general, the court will find hearsay evidence trustworthy when there are sufficient 'indicia of reliability.' [Citation.] Such a determination rests within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. [Citation.]" (*People v. Brown* (1989) 215 Cal.App.3d 452, 454-455 (*Brown*).)

Our Supreme Court has recognized a distinction between the admissibility of "testimonial" evidence and traditional documentary evidence that does not have, as its source, live testimony. (*People v. Arreola* (1994) 7 Cal.4th 1144, 1156-1157 (*Arreola*).) Testimonial evidence is admissible only on a showing of unavailability or other good cause, whereas documentary evidence is admissible (even if it would not be admissible under traditional rules of evidence) if it bears sufficient indicia of reliability. (*Ibid.*)

7

*Arreola* explained why testimonial and documentary evidence merit different levels of scrutiny. "[T]he need for confrontation is particularly important where the evidence is testimonial, because of the opportunity for observation of the witness's demeanor. [Citation.] Generally, the witness's demeanor is not a significant factor in evaluating foundational testimony relating to the admission of evidence such as laboratory reports, invoices, or receipts, where often the purpose of this testimony simply is to authenticate the documentary material, and where the author, signator, or custodian of the document ordinarily would be unable to recall from actual memory information relating to the specific contents of the writing and would rely instead upon the record of his or her own action." (*Id.* at p. 1157, fn. omitted.)

Cases have recognized routine laboratory reports are not testimonial in nature but are documentary evidence admissible in probation revocation hearings if the court finds them reliable. For example, in *People v. Johnson* (2004) 121 Cal.App.4th 1409, 1413 (*Johnson*), admission of a crime laboratory report that the substance the probationer was observed selling was rock cocaine was admissible because it was not a substitute for live testimony at the probation revocation hearing; it was routine documentary evidence. Moreover, the report was trustworthy because a police officer testified it was identified by case number and the probationer's name and came from the crime laboratory that routinely tested narcotics for the police department. (*Id.* at p. 1411, fn. 1.) And in *Brown*, *supra*, 215 Cal.App.3d 452, the court held admissible a police officer's testimony "relating the findings of a chemist's test on confiscated substances at a probation revocation proceeding." (*Id*. at p. 453.) The court reasoned the officer's testimony about the chemist's findings was trustworthy and reliable because the officer explained he "routinely passed the confiscated substances on to the police chemist who subsequently conducted the test." (*Id*. at p. 455.) As such, the test results were part of the "'regular business'" of the police laboratory, and there was nothing to indicate they were anything but trustworthy and reliable. In addition, other evidence was presented to

8

corroborate the results of the testing (articles of cocaine paraphernalia seized at his arrest and the chemist's case evidence disposition sheet). (*Ibid*.; see also *People v. O'Connell* (2003) 107 Cal.App.4th 1062, 1066-1067 (*O'Connell*) [report from director of drug counseling program stating probationer had been terminated from program admissible].)

We recognize that unlike *Johnson* and *O'Connell*, where the reports were admitted into evidence, here, as in *Brown,* the probation officer testified to the contents (and results) of the reports. But the fact the information (positive test results) came from the probation officer's testimony about the content of the lab reports, as opposed to the reports themselves, does not render the testimony about the results inadmissible.

*People v. Abrams* (2007) 158 Cal.App.4th 396, 400 (*Abrams*), is instructive. In that case, the probation officer testified defendant had failed to report to probation or make required payments referring to another probation officer's report documenting defendant's failures to report, and the probation department's computer records. As to the latter, the probation officer provided foundational testimony to explain "how calls are logged into the system and that the records showed defendant had not called the probation office." (*Id.* at p. 404.) The court concluded the information about failing to report and failing to make payments was similar to the laboratory reports and counseling reports at issue in *Johnson* and *O'Connell* (i.e., documentary evidence, not testimonial). And with regard to the probation officer's testimony about the information contained in another probation officer's report about defendant's failure to report, the court concluded: "We see no difference, in this setting, between receiving the reports in evidence and allowing [the probation officer] to testify to their contents. Defendant's objection was to the hearsay of the report's contents, not to the use of secondary evidence. (Evid. Code, §§ 1520-1523.)" (*Abrams*, *supra*, 158 Cal.App.4th at p. 404, fn. 4; in accord *People v. Gomez* (2010) 181 Cal.App.4th 1028.) In other words, there was no suggestion the probation officer was not accurately stating the contents of the other probation officer's report.

Here, the probation officer's testimony was about the contents of the lab reports, which was the kind of documentary evidence at issue in *Abrams*, *Johnson,* and *O'Connell*. And we cannot say the trial court abused its discretion in finding the testimony bore sufficient indicia of reliability and, thus, was admissible in this PRCS revocation proceeding. (*Brown, supra,* 215 Cal.App.3d at pp. 454-455.) Rodriguez established the reports were reliable by explaining for the past nine years she (i.e., the probation department) had submitted hundreds of samples from probation department supervisees to Redwood Toxicology for testing. She received both positive and negative test results and trusted and relied on that laboratory's results. She described in detail her practice and procedure for obtaining fluid samples from supervisees, and that she followed those protocols with Schuster. Rodriguez testified she labeled the samples with Schuster's name and case number, which she then utilized when downloading the test results from the laboratory's website to confirm she had the correct test results. (See *Johnson, supra,* 121 Cal.App.4th at p. 1411, fn. 1 [lab report trustworthy because police officer testified it was identified by probationer's name and case number and came from crime laboratory that routinely tested narcotics for department].) Additionally, Schuster does not dispute that the laboratory reports stated the three samples obtained from Schuster were positive for methamphetamine. He suggests that without the actual lab reports, he was unable to meaningfully challenge the reliability of the results. But that was not the objection he raised below.

Although the prosecutor did not subpoena the lab reports, neither did Schuster—which he certainly could have had he disputed the results. And we are satisfied there was at least some additional corroboration of the results. The probation officer testified that after receiving the positive test results, she and Schuster discussed the positive test results and that he needed to seek treatment for his drug addiction. In those discussions Schuster did not dispute he was using methamphetamine. Moreover, as the probation report, upon which the trial court could rely (see § 1203.2, subd. (a)

10

[probation revoked if court has "reason to believe from the [probation officer's] report" conditions of probation have been violated]; § 1203.2, subd. (b)(1) [court shall read and consider report of probation officer]), indicated Schuster admitted his continued use of methamphetamine. And at the sentencing portion of the PRCS revocation hearing, Schuster's counsel did not dispute Schuster continued his methamphetamine but argued his use was "self-medicating" driven by his mental illness and upheavals in his personal life.

That there is no serious dispute Schuster has continued to use illegal drugs while on PRCS distinguishes his case from *U.S. v. Martin* (9th Cir. 1993) 984 F.2d 308 (*Martin*), the case upon which Schuster primarily relies. In *Martin*, defendant on supervised release was charged with four violations of the conditions of his release. Defendant did not contest three of the violations based upon his failures to report and leaving jurisdiction without permission. Defendant did contest one of the violations based upon his submission of two urine specimens that tested positive for cocaine and methadone—a violation that resulted in an enhanced sentence. (*Id.* at p. 309.) The only evidence of the latter violation was the testimony of the drug counselor (with only three months experience with the particular lab) who collected the specimen as to the test results. (*Id.* at pp. 309, 314, fn. 10.) When on cross-examination, the drug counselor indicated the samples were likely available for retesting, defendant's counsel—which had just been appointed that day—requested the district court allow independent retesting of the samples. The court denied the retesting request. The court of appeals held the district court's admission of the laboratory results based solely on the testimony of the drug counselor combined with its refusal to allow independent retesting of the specimens violated defendant's right to due process. (*Id.* at p. 314; but see *U.S. v. Penn* (11th Cir. 1983) 721 F.2d 762, 766 [probation officer's testimony about results of probationer's positive drug test admissible].)

11

Here, probation officer Rodriguez's testimony about the reliability of the lab results exceeded that of the drug counselor in *Martin*—Rodriquez had sent hundreds of samples for the past nine years to Redwood Toxicology and had been trained by the probation department as to obtaining the results. Schuster did not directly challenge the results, seek the reports, or seek retesting. In short, we cannot say the trial court abused its discretion or violated Schuster's due process rights by admitting Rodriguez's testimony about the results of the laboratory tests.

### DISPOSITION

The order is affirmed.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


MOORE, J.